# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **JARED N. HUGHES,** )<br><br>**Plaintiff,** )<br><br>**vs.** )<br> )<br>**MICHAEL J. ASTRUE,** )<br>**Commissioner of Social Security,** )<br> )<br>**Defendant.** ) | **Case number 4:11cv1566 JCH**<br>**TCM** |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of Jared N. Hughes for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b. Mr. Hughes has filed an opening brief and reply brief in support of his complaint; the Commissioner has filed a brief in support of his answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Jared N. Hughes (Plaintiff) applied for DIB in September 2008 and for SSI in October 2008, alleging he was disabled as of October 5, 2007, by attention deficit disorder (ADD),

oppositional defiant disorder (ODD), and mild mental retardation. (R.[1] at 126-35.) His applications were denied initially and after a hearing held in January 2010 before Administrative Law Judge (ALJ) Victor L. Horton.[2] (Id. at 4-50, 54-58.) The Appeals Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Delores E. Gonzalez, M.Ed., testified at the administrative hearing.

Plaintiff testified that, at the time of the hearing, he was 21 years of age and lived in a house with his girlfriend's father and his son. (Id. at 11.) His only current income is food stamps. (Id. at 14.) Neither he nor his girlfriend, who is expecting their child, is working. (Id.) Her father is paying for everything until they can get jobs. (Id.) He is seeking DIB and SSI only for mental problems. (Id. at 12.)

Plaintiff graduated from high school. (Id. at 12.) When in school, he had participated in a training program for a "supermarket career," e.g., merchandise ordering. (Id..) Plaintiff can read, although he is not a "very good reader," and do simple arithmetic, although he is not good at subtraction. (Id. at 13, 23.) He can make change. (Id. at 13.) His handwriting is not very good. (Id.)

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

[2]Plaintiff had applied for DIB in 2006, but had not proceeded past the initial denial in November 2006. (Id. at 221.)

Plaintiff's last job was working as a janitor at a casino. (<u>Id.</u> at 15.) He was fired. (<u>Id.</u>) Asked why, he explained that he "was always stressed out" and would fall asleep on the job during his early-morning break. (<u>Id.</u>) He had no problem doing the work. (<u>Id.</u> at 21.) Before that job, Plaintiff worked unloading trucks and stocking shelves at Toys 'R Us. (<u>Id.</u> at 16.) He quit that job when he had to undergo foot surgery. (<u>Id.</u>) The job before that was at Shop 'N Save and was for approximately eighteen months. (<u>Id.</u>) He got the job when his mother – an employee there for thirteen years – filled out the application for him. (<u>Id.</u> at 28.) He was fired from that job when he responded to a manager "cuss[ing] [him] out" and "call[ing] him a retard." (<u>Id.</u> at 21.)

Plaintiff further testified that he is currently looking for a job. (<u>Id.</u> at 17.) Although he has had many interviews, no one will hire him. (<u>Id.</u>) He had learned in the training program to operate a cash register and help manage a store. (<u>Id.</u> at 17-18.) Although he had had no problems keeping up and had tried for a job in the supermarket field, no one would hire him. (<u>Id.</u> at 18.)

Asked by the ALJ to explain why he could not work, Plaintiff testified that he has had problems holding a job. (<u>Id.</u> at 18-19.) He has been told him he can not get along with people. (<u>Id.</u> at 19.) He easily becomes angry because he does not like to be called names, made fun of, or pushed around. (<u>Id.</u>) If people are not making fun of him, he has no problem being around them. (<u>Id.</u> at 20.)

Plaintiff is currently taking medication to control seizures. (<u>Id.</u>)

He is trying to get an appointment to be treated for depression. (<u>Id.</u> at 22-23.)

He has twice failed the test for a driver's license.  (<u>Id.</u> at 25.)

He helps around the house by doing laundry and the dishes.  (<u>Id.</u> at 25.)  He has no problem with either task.  (<u>Id.</u>)  He does not cook because he "only know[s] how to heat stuff up in the microwave."  (<u>Id.</u>)  He also vacuums and mows the grass.  (<u>Id.</u> at 25-26.)

Ms. Gonzalez testified as a vocational expert (VE).  She classified Plaintiff's past work as a cart handler as medium, unskilled; as a cleaner as light, unskilled; and as a stocker as heavy, semi-skilled.  (<u>Id.</u> at 30.)  The ALJ asked her about jobs that can be performed by a hypothetical claimant who is of Plaintiff's age and has his education, training, and work experience.  (<u>Id.</u>)  Also, this claimant has no exertional limitations and can understand, remember, and carry out at least simple instructions and non-detailed tasks.  (<u>Id.</u>)  His judgment is adequate for making simple, work-related decisions.  (<u>Id.</u>)  He can perform repetitive work according to set procedures, sequences, and pace.  (<u>Id.</u>)  The VE replied that this hypothetical claimant can perform Plaintiff's past work as a cart handler and cleaner.  (<u>Id.</u>) These jobs exist in significant numbers in the state and national economies.  (<u>Id.</u>)  This claimant can not perform Plaintiff's past work as a stocker – it is semi-skilled.  (<u>Id.</u> at 31.)

The ALJ then described a hypothetical claimant who, in addition to the foregoing attributes, can only maintain concentration and attention for two-hour segments in an eight-hour period; respond appropriately to supervisors and co-workers in a task-oriented setting with casual and infrequent contact with others; and perform work at a normal pace without production quotas.  (<u>Id.</u>)  The VE replied that this claimant can perform Plaintiff's past work as a cart handler and cleaner.  (<u>Id.</u> at 32.)

If this hypothetical claimant is not able to maintain concentration and attention for two-hour segments in an eight-hour period and has to be reminded weekly of some of his tasks, he will not be able to perform in a competitive labor market and will need accommodations. (Id.) If this hypothetical claimant has the limitations of the second hypothetical claimant and will have up to two confrontations monthly with either co-workers or managers, he will not be able to maintain competitive employment. (Id.)

The VE stated that her testimony is consistent with the *Dictionary of Occupational Titles* (DOT). (Id. at 33.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, school and vocational training records, and records from health care providers.

When applying for DIB and SSI, Plaintiff completed a Disability Report. (Id. at 224-31.) He listed his height as 5 feet 10 inches tall and his weight as 200 pounds. (Id. at 224.) He is limited in his ability to work by ADD, ODD, and mild mental retardation. (Id. at 225.) These limitations cause him trouble working in a group, getting along with others, including those in authority, and getting confused if given multiple directions. (Id.) Medication makes him tired and lethargic. (Id.) His impairments first limited his ability to work on October 5, 2007, and prevented him from working that same day. (Id.) The job he has held the longest is as a courtesy clerk. (Id. at 226.) He worked at this job from August 2005 to October 5, 2007. (Id.)

Plaintiff's fiancé completed a Function Report – Third Party on his behalf.[3]  (Id. at 232-38.)  She has known him for six years.  (Id. at 232.)  They now live together.  (Id.)  Asked to describe what Plaintiff did during the day, she replied that he eats and plays video games.  (Id.)  He feeds their pets and takes the dog outside.  (Id. at 233.)  His impairments cause him to become agitated and unable to sleep.  (Id.)  He has to be reminded to shave, has trouble cooking and usually eats snacks, and has problems cleaning his face and brushing his teeth.  (Id.)  He has to be reminded to take his medication.  (Id. at 234.)  He has trouble reading, following directions, and staying on task.  (Id.)  He can do the laundry, mowing, and thorough cleaning.  (Id.)  He does not need help or encouragement to do these things.  (Id.)  Although he can go out alone, he prefers not to.  (Id. at 235.)  He does not have a driver's license or the motivation to get one.  (Id.)  His hobbies include watching television, walking, and playing video games.  (Id. at 236.)  He does these daily and "very well."  (Id.)  He has trouble getting along with his mother and siblings.  (Id.)  His impairments affect his abilities to understand, talk, follow instructions, complete tasks, get along with others, remember, and concentrate.  (Id. at 237.)  He needs to have things explained in simple language.  (Id.)  He needs spoken instructions repeated twice.  (Id.)  And, he has some trouble complying with rules.  (Id.)  He has been fired for being argumentative and disagreeable with co-workers and managers.  (Id. at 238.)  He does not handle changes in routine well; he becomes nervous and worried.  (Id.)

---

[3]Although the form was completed by the fiancé, both she and Plaintiff signed it.

Plaintiff completed a Disability Report – Appeal form after the initial denial of his applications. (Id. at 244-49.) Since completing the initial report, he has begun to feel hopeless, rejected, and confused, and has had sudden crying spells. (Id. at 245.) These changes occurred in approximately November 2008. (Id.) He also has an infected ingrown toenail and can only wear open-toed sandals. (Id.) He has not seen any health care providers since completing the initial report. (Id.) He takes Epitol for his seizures and paroxetine for depression.[4] (Id. at 246.) Both were prescribed by Greg Mattingly, M.D. (Id.) He has no permanent place to live and is unemployed. (Id. at 247.) He is not capable of cleaning, shopping, paying bills, obtaining a driver's license, or taking public transportation. (Id.)

Plaintiff had annual earnings of $2,311[5] in 2005; $6,686 in 2006; $7,479 in 2007; and $468 in 2008. (Id. at 141.) None of his earnings are sufficient to be considered substantial gainful activity. (Id. at 35.)

School records and records of Plaintiff's participation in programs designed to assist people in obtaining employment were before the ALJ and include the following.

Educators met in February 1998 to discuss Plaintiff's needs after he transferred into the St. Charles School District from another district. (Id. at 196-99.) His adaptive behavior skills were found to be below age expectancy. (Id. at 196.) He had problems understanding new vocabulary, comprehending new language, recognizing basic sight words, understanding and remembering what he had read, memorizing or writing spelling words, recalling basic

---

[4]Paroxetine hydrochloride is the generic name for Paxil and is prescribed for the treatment of major depressive disorder. See Physicians' Desk Reference, 1491, 1492 (65th ed. 2011).

[5]All sums are rounded to the nearest dollar.

math words, and doing addition and subtraction.  (Id.)  He was functioning below age level, emotionally and behaviorally.  (Id.)  He had difficulty attending to a task for longer than a few minutes.  (Id. at 197.)  And, he resisted doing tasks that he thought would be too difficult. (Id.)

Plaintiff's Individualized Education Program (IEP) team met in September.  (Id. at 204-10.)  Plaintiff was then ten years old.  (Id. at 204.)  A previous diagnosis of "mildly mentally handicapped" was sustained.  (Id.)  The Psycho-Educational Evaluation Summary referred to a psychological evaluation of Plaintiff performed by David Lipsitz, Ph.D., and another evaluation by a psychiatrist, Dr. Rizzo, both resulting in a diagnosis of mild mental retardation.  (Id. at 204-05.)  It was noted that the IEP team had "concerns regarding [Plaintiff's] behavior, however these behaviors were seen as a display of age-inappropriate adaptative behaviors correlating positively with the subaverage measured IQ."  (Id. at 209.)

Plaintiff was again evaluated in October 2000, when he was in the sixth grade.  (Id. at 200-03.)  At that time, he was taking medications for attention deficit hyperactivity disorder (ADHD), seizures, and depression.  (Id. at 200.)  His full intelligence quotient (IQ), based on a 1995 test, was 69.[6]  (Id.)  He was described as being below age level in adaptive behavior, but was progressing.  (Id. at 201.)  He was also below age level in academics, but worked very hard.  (Id.)  Mathematics were a strength.  (Id.)  Socially, he was very cooperative, followed rules, had good relationships, and was communicating better.  (Id.) His vocabulary skills were weak.  (Id.)

_____

[6]Plaintiff was seven years old at the time of the test.

The next, October 2003, school record is from when Plaintiff was in the ninth grade. (Id. at 176-90.) His gross motor skills were age-appropriate; his fine motor skills were not. (Id. at 176.) His May 1997 IQ scores on the WISC-III[7] were listed; he had a verbal score of 65, a performance score of 67, and a full scale score of 63. (Id.) There was no concern with Plaintiff's speech, but there was with his use of semantics and syntax. (Id. at 177.) He was to receive language therapy. (Id.) His biology teacher noted that Plaintiff had "a very difficult time working independently" and "need[ed] one-on-one assistance." (Id. at 181.) He did, however, generally complete his assignments on time. (Id.) He was currently earning a "B" in the class, although it was with assistance. (Id.) His English teacher noted that Plaintiff was willing to work on any assignment given him and tried "pretty hard." (Id. at 183.) His current grade was a "C." (Id.) His civics teacher described him as not trying to work on assignments. (Id. at 185.)

The next IEP meeting was in February 2006; Plaintiff was in the eleventh grade. (Id. at 152-75, 191-95.) The primary diagnosis was "mentally handicapped." (Id. at 152.) He was to receive specialized instruction in reading and writing for 212 minutes per week in a special education classroom, counseling by a social worker, and specialized instruction in

---

[7]"The WISC-III [Wechsler Intelligence Scale for Children-III] measures general intellectual functioning. The Full Scale IQ provides a measure of general intelligence. The Verbal IQ provides a measure of verbal comprehension, including the application of verbal skills and information to the solution of new problems, ability to process verbal information, and the ability to think with words. The Performance IQ provides a measure of perceptual organization, including the ability to think in visual images and to manipulate these images with fluency and relative speed, to reason without the use of words and to interpret visual material quickly." **Scott ex rel. Scott v. Astrue**, 529 F.3d 818, 820 n.1 (8th Cir. 2008).

language for 30 minutes per week, also in a special education classroom. (Id.) It was noted that Plaintiff had been diagnosed with ADHD, ODD, depression, and seizures. (Id. at 153.) He took medication for each of these conditions. (Id.) He continued to struggle with receptive and expressive language skills, to display difficulty with vocabulary, and to have trouble paraphrasing information. (Id.) He was easily frustrated and complained about completing homework and of the expectations of him. (Id.) He also had difficulty with pragmatic skills, problem solving, logical reasoning, and inferring. (Id.) His conversational skills, whether with peers or adults, were poor. (Id.) With assistance, he could write a simple sentence. (Id.) He needed repeated concrete examples to understand new concepts in mathematics. (Id.) His study skills were weak. (Id.) He had difficulty maintaining attention in class. (Id. at 154.) He could follow school and classroom rules, but was slow in accepting responsibility for his own actions. (Id.) He was reportedly doing well in a career supermarket program, and had been described as "a very hard worker." (Id.)

His IEP goals included improving self-direction by staying on task for progressively longer periods of time, improving social interaction by appropriately solving problems in disagreements, using an appropriate tone of voice when speaking with peers or adults, identifying appropriate behavior, completing assignments within the time allotted, and being self-directed by identifying work that needs to be done. (Id. at 155, 159, 161.) It was anticipated that Plaintiff would graduate in June 2007. (Id. at 173.)

In December 2006, a special education teacher with the District completed a Teacher Questionnaire submitted by the Missouri Section of Disability Determinations. (Id. at 212-

19.)  In the area of acquiring and using information, she rated Plaintiff as having an obvious problem in two of the ten activities, a serious problem in five, and a very serious problem – the highest degree of difficulty – in three.  (Id. at 213.)  In the area of attending and completing tasks, Plaintiff was rated as having no problem in two of the thirteen activities, a slight problem in four, an obvious problem in one, and a serious problem in the remaining six.  (Id. at 214.)  All problems occurred daily.  (Id.)  She noted that Plaintiff needed a lot of guidance, but had done his best when working alone in the supermarket careers program at the technology school.  (Id.)  In the area of interacting and relating with others, Plaintiff had no problem in one of the thirteen activities, a slight problem in two, an obvious problem in seven, a serious problem in two, and a very serious problem in one.  (Id. at 215.)  All but the activity of appropriately expressing anger – an activity in which he an obvious problem – occurred daily.  (Id.)  That one activity occurred weekly.  (Id.)  It had not, however, been necessary to implement behavior modification strategies for Plaintiff.  (Id.)  Plaintiff's functioning ability in the area of moving about and manipulating objects was age-appropriate.  (Id. at 216.)  In the area of caring for himself, Plaintiff had no problem in four of the ten activities, a slight problem in two, an obvious problem in two, and a serious problem in two.  (Id. at 217.)  These last two problems were in the activities of identifying and appropriately asserting his emotional needs and of responding appropriately to changes in his own mood.  (Id.)  When he had a problem, it occurred daily.  (Id.)

In May 2007, Plaintiff sought assistance from Jessica Paluch at Community Living, Inc. (CLI), in obtaining full-time employment.  (Id. at 370.)  His job interests were manual

labor, factory work, and stocking.  (Id. at 371.)  He was assessed as needing to work in a small group or alone.  (Id.)  He was good with the public in small amounts.  (Id.)  His strengths included being well-groomed, following directions and accepting supervision, consistently performing quality work, working independently, staying on task for 70 to 80 percent of the time, and working at a production rate between 70 to 75 percent.  (Id.)  He would need employment support of a list of tasks to help him remember each step.  (Id.)  It was noted that, although he accepted supervision, "some of [his] mannerisms could be interpreted as a 'bad attitude' or negative."  (Id.)  As part of the job program, Plaintiff worked for four hours each at a Schnucks grocery store, at CLI's group homes performing such maintenance tasks as painting, and at a uniform company.  (Id. at 373-74.)  Each was considered to be a good job match for him.  (Id.)  Plaintiff was to bring Ms. Paluch, a job coach, three job leads when they met each week and was encouraged to continue to work hard at his current job at Shop 'N Save.  (Id. at 376.)

Plaintiff consulted Maureen Hentz at the Division of Vocational Rehabilitation in October 2008 after having graduated from high school, losing his job, and being unable to find other work for a year.  (Id. at 368-69.)  He had worked at Shop 'N Save as a bagger and been promoted to night stocker.  (Id. at 368.)  He then had a problem with a supervisor, however, and had been fired.  (Id. at 368-69.)  His impediments to employment were slow processing of information, impulsive decision-making skills, and difficulty completing tasks due to easily becoming distracted.  (Id.)  His strengths included self-direction and interpersonal skills.  (Id. at 369.)  He was financially dependent on his mother and stepfather

and was eager to obtain employment in order to support his girlfriend and their daughter. (Id.)  The following week, Plaintiff contacted Ms. Hentz to report he had a seasonal job working the third shift at Toys 'R Us.  (Id. at 367.)  He wanted to obtain a full-time, permanent day job.  (Id.)

Plaintiff next contacted Ms. Hentz in February 2009.  (Id. at 365.)  He was then living with his grandfather, who was helping him apply for Medicaid.  (Id.)  The following week, Plaintiff met with Ms. Hentz, explaining that his grandfather was helping him apply for Social Security benefits.  (Id. at 363.)  Plaintiff wanted to get a full-time job as a cleaner or stocker.  (Id.)  Ms. Hentz described Plaintiff as "upset and crying" when he called her on March 17.  (Id. at 359.)  He had been given a lead for a job at Steak 'N Shake, but did not want the job due to the hours and it not being "his vocational goal."  (Id.)

Plaintiff reported to Ms. Hentz on April 14 that he had a job with Wal-Mart.  (Id. at 352.)  He had completed five interviews before being offered the job.  (Id.)  He was no longer interested in job coaching or retention services.  (Id.)  Nine days later, Plaintiff's girlfriend called to report that he did not have a job at Wal-Mart and simply did not want the help of a job coach.  (Id. at 351.)  When called to the telephone, Plaintiff refused to speak to Ms. Hentz.  (Id.)  The next day, Plaintiff called to say he was interested in help with getting a job but did not need a job coach.  (Id. at 350.)  In May, Plaintiff reported he had a custodial job at a casino for twenty-four hours a week.  (Id. at 349.)  He informed Ms. Hentz that he did not need the assistance of a job coach to be successful at his new job.  (Id.)  Plaintiff complained the next day of having to sit through an eight-hour orientation at that job.  (Id.

at 348.)  Three weeks later, Plaintiff called to report he had been fired for falling asleep for five minutes.  (Id. at 347.)  Working the third shift had been too hard on him.  (Id.)  He explained that he could not get another job because he did not have transportation.  (Id.)

When Plaintiff contacted Ms. Hentz in August, she gave him the resources for getting free medication.  (Id. at 344.)  Plaintiff informed her that he was agreeable to accepting job coaching services on a job to help him understand his responsibilities.  (Id.)  He was concerned that, without his medication, he would become violent with his girlfriend.  (Id.)  Later that same month, Ms. Hentz noted that Plaintiff would need help completing mock interviews and would need a job coach to help him understand written directions should he get a job.  (Id. at 339.)  He had difficulty processing information and solving problems, was easily distracted, "exhibit[ed] impulsive decision making skills, [and] ha[d] poor work completion."  (Id.)  Ms. Hentz opined that Plaintiff would need a job coach to teach him the basic skills of a job.  (Id.)  Ms. Paluch noted on November 19 that Plaintiff was to have an interview at a store and that the manager had informed her that she would not be allowed in the interview and that, if Plaintiff got the job, coaching was not allowed.  (Id. at 336.)  After many complications, a meeting was scheduled in the following January for Plaintiff with Ms. Paluch.  (Id. at 330.)  On December 30, Plaintiff advised Ms. Hentz that he had "been very busy with appointments with his therapist, parenting classes, meetings at DSS and remodeling his home."  (Id. at 331.)  He was overwhelmed with all his meetings and the responsibilities connected with the anticipated birth of his child.  (Id.)  The next day, Plaintiff cancelled the meeting, advising Ms. Hentz that he did not want a job coach.  (Id. at 329.)  On January 21,

2010, he informed Ms. Hentz that he was not sure when he could proceed with "another job developer" as his girlfriend was in the hospital having a baby and was having heart problems. (Id. at 326.)  She explained that his case could be closed and then he "[could] reapply when he [was] ready to participate in employment services."  (Id.)  The next day, he told Ms. Hentz that he needed stable work but felt he was not getting good job leads because his girlfriend was jealous of the job coach.  (Id. at 325.)  He was to contact her the following month to discuss obtaining job development services through another agency.  (Id.)  She noted that Plaintiff often misunderstood what she told him and would not tell her if he was confused. (Id.)

The medical records before the ALJ begin when Dr. Mattingly saw Plaintiff on October 27, 2006.  (Id. at 253-54.)  He noted at that visit that Plaintiff was alert and oriented to time, place, and person; had no suicidal or homicidal ideation; had no hallucinations; and had fair insight and judgment.  (Id. at 254.)  His mood was "good."  (Id.)  In November, Plaintiff's mental status was the same with the exception of having a "bad" mood.  (Id. at 256.)  He was diagnosed with depression and ADHD.  (Id.)  His diagnosis was unchanged at the next, January 2007, visit.  (Id. at 257.)

Dr. Mattingly renewed Plaintiff's prescriptions for Tegretol (an anti-seizure medication) and Paxil[8] on December 7, 2007.  (Id. at 304.)

The next record of Dr. Mattingly is a notation on April 2, 2009, that Plaintiff's prescription for Paxil would not be renewed until he had been seen.  (Id. at 304.)

_____

[8]See note 4, supra.

- 15 -

Plaintiff sought medical attention at the St. Joseph Health Center (St. Joseph) emergency room on March 11, 2008, after his stepfather punched him in the eye. (<u>Id.</u> at 278-89.) An abrasion above his swollen left eye was treated, and Plaintiff was released. (<u>Id.</u> at 283-84.)

Plaintiff returned to the St. Joseph emergency room on October 12, having sprained his left wrist when he fell off his bike. (<u>Id.</u> at 290-302.) X-rays were taken confirming the absence of any broken bones, and Plaintiff was released. (<u>Id.</u> at 296, 302.)

Plaintiff was treated by Daniel D. Kiddy, D.P.M., on January 14, 2009, for an infected ingrown toenail on his left foot. (<u>Id.</u> at 307-08.) In April, September, and November, he was treated for infected ingrown toenails on both feet. (<u>Id.</u> at 306, 309.)

Pursuant to his applications, Plaintiff was evaluated in November 2008 by a licensed psychologist, Thomas J. Spencer, Psy.D. (<u>Id.</u> at 259-62.) Plaintiff described his primary complaint: "I have trouble reading and I have trouble saying stuff and I have trouble getting along and I have anger issues." (<u>Id.</u> at 259.) He reported being suspended from school several times and expelled once due to his temper. (<u>Id.</u>) "He described himself as quiet until provoked." (<u>Id.</u>) He described his mood as "'a little depressed.'" (<u>Id.</u>) On examination, Plaintiff had a bland affect, apparently limited insight and judgment, noticeably delayed motor behavior, and was alert and oriented to time, place, person, and event. (<u>Id.</u> at 260.) His flow of thought was normal. (<u>Id.</u>) He was then working nights stocking shelves at Toys 'R Us and was tired. (<u>Id.</u>)

Plaintiff was administered the Wechsler Adult Intelligence Scale – III (WAIS-III). (Id. at 261.) His verbal IQ was 71, his performance IQ was 76, and his full scale IQ was 71, placing him in the borderline range of intellectual functioning. (Id.)

Dr. Spencer diagnosed Plaintiff with depressive disorder, not otherwise specified (NOS)[9]; ADHD, by history; "[b]orderline intellectual functioning v. mild mental retardation"; and a Global Assessment of Functioning (GAF) of 50-55.[10] (Id.) He opined that Plaintiff had the capacity to understand and remember simple instructions and to engage in, and persist with, simple tasks. (Id. at 262.) He had a moderate impairment in his ability to interact social and to adapt to changes in the work environment. (Id.)

Ten days later, after receiving Dr. Spencer's report, Kyle DeVore, Ph.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff. (Id. at 263–73.) He assessed

---

[9]According to the [Diagnostic and Statistical Manual of Mental Disorders (4th Ed. Text Revision 2000] DSM-IV-TR, each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category. DSM-IV-TR at 4. This category may be used in one of four situations: (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class. Id.

[10]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning,'" Hudson v. Barnhart, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, Hurd v. Astrue, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

Plaintiff as having an organic mental disorder, i.e., borderline intellectual functioning and ADHD, and an affective disorder, i.e., depressive disorder NOS. (Id. at 263, 264, 266.) These disorders resulted in mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Id. at 271.) They did not cause any episodes of decompensation of extended duration. (Id.) Dr. DeVore noted Plaintiff's 1997 IQ scores only, but did not check the box under "Mental Retardation" for a valid verbal, performance, or full scale IQ of 60 through 70. (Id. at 266, 273.)

Dr. DeVore also completed a Mental Residual Functional Capacity Assessment of Plaintiff. (Id. at 274-76.) He concluded that in the area of understanding and memory, Plaintiff was not significantly limited in two abilities and was moderately limited in one, i.e., the ability to understand and remember detailed instructions. (Id. at 274.) In the area of sustained concentration and persistence, he was not significantly limited in four of the eight abilities and was moderately limited in the remaining four: the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination or proximity to others without being distracted by them; and the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace. (Id. at 274-75.) In the area of social interaction, he was not significantly limited in three of the five activities and was moderately limited in the other two – the ability to accept instructions and respond appropriately to criticism from supervisors and the ability to get along with coworkers or

peers without distracting them or exhibiting behavioral extremes.  (Id. at 275.)  And, in the area of adaptation, Plaintiff was not significantly limited in two of the three relevant abilities and was moderately limited in the remaining one:  the ability to respond appropriately to changes in the work setting.  (Id.)

Pursuant to an application for Medicaid benefits, Plaintiff underwent a physical evaluation in October 2009 by Riaz A. Naseer, M.D.  (Id. at 311-15.)  Plaintiff's chief complaint was his seizures, which had begun when he was fifteen years old.  (Id. at 311.)  He had "not had any specific seizures since the first seizure."  (Id.)  He had been told that the seizure defect was caused by "calcification of his brain."  (Id.)  Plaintiff took medication, Trileptal, to treat his seizures.  (Id.)  On examination, he was alert and oriented to time, place, and person.  (Id. at 311, 312.)  His speech was normal; his recent and remote memory and his insight and judgment were all fair.  (Id. at 312.)  He had no visual, motor, or reflex difficulties.  (Id.)  He had no evidence of sensory or cerebellar deficits.  (Id.)  Aside from his history of generalized seizures, his general physical examination was normal; his neurological examination was non-focal.  (Id.)  He had a full range of motion.  (Id. at 314-15.)

The same day, for the same reason, Plaintiff underwent a psychological evaluation by Bridget Graham, Psy.D., a licensed psychologist.  (Id. at 316-21.)  Dr. Graham did not have his medical records; he did tell her Dr. Mattingly's name and show her a prescription bottle for his seizure medication.  (Id. at 320.)  His chief complaints were of seizures and mental problems.  (Id. at 316.)  He was trying to obtain state medical assistance benefits because he could not afford his seizure medication.  (Id.)  Plaintiff reported that he had had a grand mal

seizure when fourteen and had been hospitalized for a week. (Id.) His medication had prevented him from having a second seizure. (Id.) Previously, he had taken Adderall for ADHD/ODD and, for a brief period, another medication for depression. (Id. at 317.) He no longer took either. (Id.) Plaintiff related incidents of physical abuse by his father, mother, and his mother's various boyfriends. (Id.) He had a good relationship with his girlfriend of two years and with her parents, with whom he was living. (Id.) He described his education as being "wrought with behavioral problems," including being expelled and suspended. (Id.) He had had jobs "'mostly a year to a couple of years apart'" and attributed the infrequency to difficulty finding a job and his family moving every four months. (Id. at 318.) Presently, he had a job coach who was helping him fill out applications. (Id.) Although he had had some interviews, he had not been hired. (Id.)

On examination, he had a "dull and depressed" facial expression, a flat affect, and appeared to have some psychomotor retardation. (Id.) He maintained good eye contact with the examiner and was consistently pleasant and cooperative. (Id.) He had slow, clear, and coherent speech and gave informative, relevant, and logical responses to questions. (Id.) He did not appear to have any difficulty during the interview with attention or concentration. (Id.) He was oriented to person, place, and time, and had an intact recent memory. (Id.) He could identify the current president, but only one of the past four presidents. (Id.) He could correctly complete several simple calculations and gave fair answers to two social comprehension questions. (Id.) His abstract thinking was poor, and he was unable to explain two common proverbs. (Id.)

Plaintiff described his mood as depressed and always unhappy.  (<u>Id.</u> at 319.)  His periods of sadness were infrequent and lasted ten to twenty minutes.  (<u>Id.</u>)  He enjoyed playing video games and being with friends.  (<u>Id.</u>)  Neither his sleep pattern nor his appetite had changed.  (<u>Id.</u>)  He denied any current or past suicidal ideation.  (<u>Id.</u>)  He has a temper and easily becomes upset.  (<u>Id.</u>)  When he is angry, he will swear or yell, but seldom gets physical.  (<u>Id.</u>)  He gets angry when someone makes fun of him or his girlfriend or calls them names.  (<u>Id.</u>)  He denied any hallucinations or delusions and any current difficulty with his ability to concentrate or focus.  (<u>Id.</u>)  There was no evidence of a formal thought disorder.  (<u>Id.</u>)

Plaintiff reported that he enjoyed cooking and frequently made lasagna, tacos, and other meat dishes.  (<u>Id.</u>)  He frequently did the laundry, cut the grass, and vacuumed.  (<u>Id.</u>)  He was working on getting his driver's license.  (<u>Id.</u> at 320.)  He had no difficulties in caring for his appearance and personal grooming.  (<u>Id.</u>)

Dr. Graham diagnosed Plaintiff with depressive disorder NOS, ODD (provisional), seizure disorder, and a GAF of 65.[11]  (<u>Id.</u>)  She noted that, although he endorsed some symptoms of depression and appeared to be last mildly depressed, he did not meet the diagnostic criteria for a major depressive disorder.  (<u>Id.</u>)  He had not displayed any symptoms indicative of ADHD.  (<u>Id.</u>)  Based on his reported difficulties with anger and relating to others, he probably satisfied the criteria for a diagnosis of ODD; "however, there [was]

---

[11]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  <u>DSM-IV-TR</u> at 34 (emphasis omitted).

insufficient collateral information to offer a full diagnosis of ODD at this time." (Id.) A specific learning disability could not be confirmed or refuted. (Id. at 321.) Dr. Graham opined that Plaintiff's prognosis was "[g]ood with appropriate intervention." (Id.)

## The ALJ's Decision

The ALJ first noted that Plaintiff had sufficient earnings to satisfy the Act's insured status requirements through June 30, 2009. (Id. at 43.) He next noted that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of October 5, 2007. (Id.) The ALJ then found that Plaintiff had severe impairments of borderline intellectual functioning, ADHD, and depression. (Id.) Although he had had a seizure when fifteen years old, he had never had another, did not take medication for it as directed, and had never had any limitations caused by seizures. (Id. at 44.)

Plaintiff's impairments did not, singly or in combination, meet or equal an impairment of listing-level severity. (Id.) The ALJ addressed the question whether Plaintiff's mental impairments resulted in the necessary degree of restrictions in his functioning, and concluded that they did not. (Id.) Specifically, he only had mild restrictions in his activities of daily living. (Id.) He performed household chores and did yard work, including mowing the lawn. (Id.) He has worked using a cash register. (Id.) He testified that he does not cook or shop for food. (Id.) He does accompany his fiancé or other family members when they shop for food. (Id.) Plaintiff has moderate difficulties in the area of social functioning. (Id.) Although he stated he had no difficulty getting along with others, he also testified that he was fired for becoming angry with a store manager. (Id.) He had a girlfriend, and his ability to

find a girlfriend and maintain a relationship with her indicates only moderate limitations in his social functioning. (Id. at 45.) He also has moderate difficulties in concentration, persistence, or pace. (Id.) He has not been able to pass the written portion of the driver's license exam, has a history of special education, and testified that he has had no problems performing jobs, but does have problems with confrontations or rule violations. (Id.) He has had no episodes of decompensation of extended duration. (Id.)

Addressing the criteria of Listing 12.05, the ALJ found that Plaintiff did not meet the requirements in paragraph "A" because he performed all his own daily living activities and was a high school graduate or in paragraph "B" because he did not have the necessary IQ. (Id. at 45-46.) Noting that paragraph "C" requires "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function," the ALJ further found that Plaintiff did not satisfy this criteria because his IQ scores on the tests administered by Dr. Spencer were all greater than 70. (Id. at 44, 46.)

With his severe impairments, Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with non-exertional limitations of being able to maintain concentration and attention for two-hour segments in an eight-hour period; demonstrating adequate judgment to make simple work-related decisions; responding appropriately to coworkers and supervisors in a task-oriented setting where contact with others was casual and infrequent; and performing work at a normal pace without production quotas. (Id. at 46.) In reaching this conclusion, the ALJ considered Plaintiff's relationship

with his girlfriend; his participation in the training program; his search for a job; his work history, including the lack of any performance problems on the job; his depression and lack of treatment thereof; his seizure; and his lack of any medication for ADHD. (Id. at 46-47.)

The ALJ also considered the credibility of Plaintiff's complaints about his symptoms. (Id. at 47-48.) His job-related problems were limited to being angry with a supervisor who called him a name, to falling asleep, and to talking on a cell-phone in violation of work rules. (Id. at 47.) He had no problems when people treated him respectfully. (Id.) He was no longer taking any medications prescribed by Dr. Mattingly, was not taking any psychiatric medication, and was not seeking any psychiatric treatment. (Id.) Records showed that Plaintiff enjoyed having a job coach, but could not attend job coaching sessions because his girlfriend was jealous of the coach; he was going to parenting classes; and he was helping his girlfriend. (Id. at 48.) At one point, he reportedly could not get a job because he had transportation problems. (Id.) Records from the Missouri Division of Vocational Rehabilitation showed that he "could perform a number of jobs as he was able to learn an [sic] number of jobs easily and performed at a 75 percent rate within a few hours of being at a job site." (Id.) Those records also revealed that he did not attend job coaching classes and vocational rehabilitation because of a scheduling conflict with parenting classes, his assistance to his girlfriend who was then having a difficult pregnancy, his "many other meetings and obligations[,]" and "his problems with too many responsibilities." (Id.) Inconsistent with his hearing testimony, he told Dr. Graham he enjoyed cooking for his girlfriend. (Id.)

The ALJ also noted that, although Plaintiff had not received treatment for any mental impairment for some time, he did not appear to Dr. Graham to be hyperactive nor did his conduct satisfy the criteria for a personality disorder. (Id.) She found him to have no difficulty staying on tasks or answering questions and to be capable of self-care. (Id.) He had poor proverb interpretation skills. (Id. at 47.) Dr. Graham did not have any records to review, as did Dr. Spencer. (Id. at 48.) Her diagnosis of ODD was provisional based on Plaintiff's reports and job problems. (Id.) Her assessment was given "some weight," whereas Dr. Spencer's assessment was given "significant weight" as it was based on psychometric testing and an evaluation of Plaintiff's educational and medical records. (Id.) Dr. Graham's written analysis, e.g., her observation that Plaintiff did not appear hyperactive, "was compelling as it [was] so consistent with [Plaintiff's] conduct and presentation at the hearing." (Id.) Thus, although her assessment was given "some weight," her report, description, and analysis of that assessment were given "similar weight to Dr. Spencer['s]." (Id.)

The ALJ next concluded that Plaintiff had no past relevant work. (Id. at 49.) With his age, high school education, and RFC, he could, however, perform jobs described by the VE. (Id. at 49-50.) He was not, therefore, disabled within the meaning of the Act. (Id. at 50.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant "is unable to engage in any substantial activity by reason of any medically determinable physical

or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. §§ 404.1520(c), 416.920(c).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.

<u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **<u>Warren v. Shalala</u>**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **<u>Moore</u>**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **<u>Ingram v. Chater</u>**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). "'[A] claimant's RFC [is] based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **<u>Moore</u>**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **<u>Wagner v. Astrue</u>**, 499 F.3d 842, 851 (8th Cir. 2007); **<u>Pearsall</u>**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **<u>Buckner v. Astrue</u>**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting <u>Moore</u>, 572 F.3d at 524). "Although 'an ALJ may not discount a claimant's allegations of disabling pain

solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" **Id.** (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 792 (8th Cir. 2005)). Moreover, an ALJ is not required to methodically discuss each of the relevant credibility factors, "'so long as he acknowledge[s] and examine[s] those considerations before discounting a claimant's subjective complaints.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1067 (8th Cir. 2012) (quoting <u>Partee v. Astrue</u>, 638 F.3d 860, 865 (8th Cir. 2011)).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Additionally, "[a]n ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as [ ]he actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007). The burden at step four remains with the claimant. **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). The Commissioner may meet his burden by

eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ is to find the claimant to be disabled.

The ALJ's decision – adopted by the Commissioner when the Appeals Council denied review – whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Perkins v. Astrue**, 648 F.3d 892, 897 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009)). When reviewing the record, however, the Court "'must consider evidence that both supports and detracts from the ALJ's decision, but [may not] reverse an administration decision simply because some evidence may support the opposite conclusion.'" **Id.** (quoting Medhaug, 578 F.3d at 813). "'If, after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Id.** (quoting Medhaug, 578 F.3d at 897). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of

benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred by (1) failing to fully consider whether he satisfied Listing 12.05C; (2) not supporting his RFC conclusions with substantial evidence on the record as a whole; and (3) not explaining the weight given to the opinions of his vocational rehabilitation counselors.

A claimant satisfies Listing 12.05C if, inter alia, he has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. Part 404, Subpart P, App.1, § 12.05C.[12]  "The claimant has the burden of proving that his impairment meets or equals a listing," **Carlson v. Astrue**, 604 F.3d 589, 593 (8th Cir. 2010); and, "'[t]o meet a listing, an impairment must meet all of the listing's specified criteria,'" **id.** (quoting Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004)).

The ALJ found that Plaintiff had severe impairments of borderline intellectual functioning, ADHD, and depression.  As noted above, "[a] 'severe  impairment is defined as one which significantly limits [the claimant's] physical or mental ability to do basic work activities.'"  **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011) (quoting Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006)) (second alteration in original).

---

[12]The Eighth Circuit has interpreted Listing 12.05C to include an onset before the age of 22. See **McNamara v. Astrue**, 590 F.3d 607, 610-11 (8th Cir. 2010).  This criteria is not in dispute.

The ALJ having found Plaintiff had two severe impairments in addition to his level of intellectual functioning, the focus turns to the question of his IQ.  See **Maresh v. Barnhart**, 438 F.3d 897, 900 (8th Cir. 2006) (claimant's personality disorder found to be severe by ALJ satisfied third requirement of Listing 12.05C "that the claimant has a physical or other mental impairment imposing an additional and significant work-related limitation of function").

In 1995 and 1997, Plaintiff had IQ scores that were within the range of Listing 12.05C. These scores, however, were when he was less than sixteen years of age.  Although "a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning," **Muncy v. Apfel**, 247 F.3d 728, 734 (8th Cir. 2001), the regulations provide that IQ test scores of forty or above are valid for only two years when the results were obtained between ages seven and sixteen, 20 C.F.R. Part 404, Subpt. P, Appx. 1, § 112.00(D)(10).

The ALJ, however, did not discuss the earlier IQ scores, including whether they were unreliable given Plaintiff's age and regardless of their relative consistency over a two-year period, and relied instead on the IQ scores resulting from a test administered by a non-treating consulting psychologist.  The lowest of these scores were the verbal and full scale IQ scores of 71.[13]  The ALJ's omission is important given the lack of any discussion whether the lower IQ scores were more consistent with Plaintiff's daily activities and behavior than the one that is but one point higher than the range for Listing 12.05C.  Cf. **Chunn v. Barnhart**, 397 F.3d 667, 672 (8th Cir. 2005) ("An ALJ may reject IQ scores that are inconsistent with a claimant's

---

[13]"[W]here more than one score is derived from a valid IQ test, an ALJ must choose the lowest score . . . ."  **Miles v. Barnhart**, 374 F.3d 694, 700 (8th Cir. 2004).

daily activities and behavior, especially when the scores are based on a one time examination by a nontreating psychologist."); accord **Christner v. Astrue**, 498 F.3d 790, 793-94 (8th Cir. 2007). Cf. also **Clark v. Apfel**, 141 F.3d 1253, 1255-56 (8th Cir. 1998) (ALJ properly rejected IQ scores of 66 and 67 assessed by non-treating psychologist and inconsistent with claimant's daily activities, including reading, writing, driving, counting money, and no records indicating mental retardation prior to age 22).

This omitted discussion should have included consideration of the observations and opinions of Ms. Hentz and Ms. Paluch about Plaintiff's limitations in the work context, including needing a list of what tasks would be involved in performing a job, difficulty processing information, impulsive decision-making skills, and difficulty completing tasks due to easily becoming distracted. Neither Ms. Hentz nor Ms. Paluch are an acceptable medical source. See 20 C.F.R. §§ 404.1513(a), 461.913(a). Consequently, they cannot be considered as treating sources and may not render medical opinions. See 20 C.F.R. §§ 404.1527(a)(2), 404.1527(d), 416.927(a)(2), and 416.927(d). They can, however, and should be, considered as "other sources." Social Security Ruling 06-3p, 2006 WL 2329939, *2 (S.S.A. Aug. 9, 2006) (including rehabilitation counselors in the list of "other sources"). As such, their observations and opinions about Plaintiff should be examined within the framework of the nature and extent of their relationship with Plaintiff, their area of speciality or expertise, the degree to which their opinions are supported by the evidence, and "any other factors that tend to support or refute the[ir] opinion[s]." **Id.** at *5. "An opinion from a 'non-medical source' who has seen the claimant in his or her professional capacity may, under certain

circumstances, properly be determined to outweigh the opinion from a medical source . . . ." **Id.** at *6.

The omission of any reference to or consideration of Ms. Hentz's and Ms. Paluch's observations and opinions is more than a forgivable deficiency in opinion writing, see **Owen**, 551 F.3d at 801 (deficiency in opinion writing that has no bearing on outcome does not require reversal of administrative decision), given that "'[m]ental retardation is not normally a condition that improves as an affected person ages,'" **Christner**, 498 F.3d at 794 (quoting <u>Muncy</u>, 247 F.3d at 734), and that there is also no discussion of whether Plaintiff's IQ and other impairments are the medical equivalent of Listing 12.05C.

A verbal IQ score of 76 and performance and full scale IQ scores of 72 were at issue in **Shontos v. Barnhart**, 328 F.3d 418, 420 (8th Cir. 2003). The claimant would need, according to the consultative psychologist, "close supervision, support, and assistance in order to respond appropriately to changes in the work place." **Id.** at 421. The question was not whether the claimant's impairments, including, among others, mild mental retardation/borderline intellectual functioning, generalized anxiety disorder, major depressive disorder, and dependent personality disorder, were equal to a listed impairment. **Id.** at 424. Rather, the question was whether they were medically equivalent to a listed impairment. **Id.** The court noted the Commissioner's instructions for determining such equivalence:

> 1. MEDICAL EQUIVALENCE AND MENTAL RETARDATION Listing 12.05C, Mental Retardation and Autism, applies primarily to adults with significantly subaverage intellectual functioning and deficits in adaptive behavior that were initially manifested in the individual's developmental period (before age 22). As with other mental impairment categories, the focus of

Listing 12.05 is on the individual's inability to perform and sustain critical mental activities of work.

. . .

Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g. 70–75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

**Id.** (quoting Program Operations Manual System, § DI 24515.056 (POMS)[14]). The claimant's IQ of 72 – "only slightly higher than the presumptive disability range of 60-70" – together with evidence that her other mental impairments "would significantly interfere with her ability to work," fatally undermined the ALJ's adverse decision. **Id.** at 424-25.

In the instant case, Plaintiff's IQ scores of 71 might well be an accurate reflection of his intellectual functioning. Cf. **Howard v. Massanari**, 255 F.3d 577, 582-83 (8th Cir. 2001) (rejecting an argument that a claimant with an IQ score of 71 "should be allowed the benefit of the mental retardation categorization" when the record did not include any other IQ testing and there was no other evidence supporting the claimed restrictions in intellectual functioning). Cf. also **Hines v. Astrue**, 317 Fed.Appx. 576, 579 (8th Cir. 2009) (per curiam) (ALJ properly considered lack of any mental health treatment for cognitive deficits and that IQ full scale score of 67 stood alone as quantitative evidence of mental retardation when

---

[14]The court also noted that the POMS guidelines are not binding on the Commissioner; however, the court "has instructed that an ALJ should consider the POMS guidelines." **Id.**

concluding that claimant did not satisfy Listing 12.05C); **Miles v. Barnhart**, 374 F.3d 694, 699 (8th Cir. 2004) (ALJ did not err in discrediting claimant's IQ score of 59 when he had, inter alia, completed a vocational training program and had never been terminated from a job for lack of mental ability); **Roberts v. Apfel**, 222 F.3d 466, 469 (8th Cir. 2000) (rejecting argument that claimant was unable to work due to a learning disability when claimant had successfully held employment for years "with the cognitive abilities he currently possesses). Lacking any discussion of the earlier IQ scores and diagnoses of mild mental retardation and of the vocational rehabilitation counselors' observations and opinions, the ALJ's decision, however, fails to sufficiently set forth the evidence that Plaintiff's mental impairments, including his IQ, do not met or medically equal Listing 12.05C.

## Conclusion

For the foregoing reasons, the Commissioner's decision should be reversed and the case remanded for consideration of whether Plaintiff's IQ scores are the medical equivalent of Listing 12.05C given his earlier IQ scores, his diagnosis of mild mental retardation, and the observations and opinions of the vocational rehabilitation counselors.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and this case be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for the further, limited proceedings as set forth above.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension

of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  31st  day of January, 2013.